**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION (AT CINCINNATI)**

| | | |
|---|---|---|
| WILLIAM P. SAWYER d/b/a/ | ) | Civil Action No.: 1:16-cv-550-JSD |
| SHARONVILLE FAMILY MEDICINE, | ) | |
| | ) | Judge: Susan J. Dlott |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S RESPONSE IN** |
| v. | ) | **OPPOSITION TO PLAINTIFF'S** |
| | ) | **MOTION FOR CLASS** |
| KRS GLOBAL BIOTECHNOLOGY, INC., | ) | **CERTIFICATION** |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Defendant, KRS Global Biotechnology, Inc. ("KRS"), hereby files this Response In Opposition to Plaintiff's Motion For Class Certification ("Motion"), filed by plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure, in an effort to convert plaintiff's individual lawsuit alleging a violation of the Telephone Consumer Protection Act and the Junk Fax Prevention Act, which amended it, codified at 47 U.S.C. § 227 (hereinafter referred to collectively, as "TCPA") into a class action.

As detailed in the attached Memorandum In Opposition, plaintiff's putative class is fatally flawed because evidence adduced in discovery establishes that individualized issues of what was sent to putative class members, and which putative class members are among the substantial number who solicited marketing material from KRS, or consented to receive it. As such, plaintiff has failed to establish that common questions of fact and law would predominate over questions affecting only individual members, Fed. R. Civ. P. 23(b)(3), and failed to establish the putative class meets the numerosity, commonality, or typicality requirements of Rule 23(a). For the reasons discussed below, this Court should deny class certification.

## MEMORANDUM IN OPPOSITION

## FACTUAL AND PROCEDURAL BACKGROUND

KRS is a Florida compounding pharmacy with nearly 90 employees that has developed its customer list over many years in business.  *See, e.g.,* Deposition of Tanner Suer ("Suer Depo."), at 11, 32; Deposition of Bruce Fromhoff ("Fromhoff Depo."), at 16-17.

The clear and undisputed evidence in this case is that the fax numbers to which KRS sent facsimile transmissions were all developed in-house by members of the KRS 20-person sales team. *See* KRS Interrogatory Responses, at 5, ¶ 16; Suer Depo., at 26 (fax "contact files" created "in the office," many of the files have been there since before Mr. Suer began working at KRS in 2013, *see id.* at 10 ); *id.* at 11-12 (KRS sales team consists of Mr. Suer, his sales director, and 18 sales associates). KRS's contact files comprise a mix of established customers and potential customers. *Id.* at 28-29; *id.* at 53 (describing three categories of contacts: (1) "Client" is someone who has "purchased" from KRS; (2) "Potential client would be a prospect that's asking buying questions; and (3) "A prospect could be someone you just talked to on the phone without asking buying questions or they're just somebody you feel is someone that would benefit from our services we provide.").  As counsel for the plaintiff summed it up:  "So KRS Global, in one form or another, slowly built a collection of fax numbers of potential customers." *See* Fromhoff Depo., at 16 (Mr. Fromhoff stating this was "correct").  Sometimes KRS salespersons acquired prospective customer contact information from publically available sources, such as Internet websites, *see* Suer Depo., at 29-30; Fromhoff Depo., at 17, but KRS has no records or other method to determine how any particular contact was developed or added to its contact list, *see id.*

There is no evidence whatever that KRS purchased or used any list or database of fax numbers, or otherwise obtained fax numbers through third parties.  In fact, all the evidence

1

adduced in this case indicates precisely the opposite: That KRS did not purchase databases or lists of fax numbers for promoting its products, and instead relied on its own customer database and its own outreach efforts. *See* Suer Depo., at 30 (KRS does not buy lists of doctors from brokers); Fromhoff Depo., at 16 (explaining KRS identified potential customers through "trade shows, business cards, meeting events, or we show up in person"); *id.* at 19 (noting KRS also acquired contact information from prospective clients through their website, when "People come to the site and say, 'Hey, I'd like to request information.'").

Further, the evidence shows that while at times KRS salespersons obtained prospective client information by researching publicly available information on the Internet, Suer Depo., at 29-30, KRS salespersons would generally call prospective clients by phone to offer to fax marketing materials, prior to faxing. *Id.* at 34 (KRS salespersons "reached out to as many physicians that we can possibly contact on a daily basis, pitch them our product, product line, . . . and ***then we would*** send them over this marketing flyer"); *id.* at 40 (when asked, "You never called anybody and said, "Hey we'd like to send you a marketing flyer to your fax machine. Will you agree to do so'?" Mr. Suer answered, "[M]y sales reps do have that conversation quite often."); *id.* at 59 (when asked about the process by which KRS salespersons faxed marketing materials, Mr. Suer stated: "Well, for instance, for one of our clients, [KRS] sales professionals presenting these medications to them would ask, 'Can we send over a flyer . . . .'"); *id.* at 60-61 (KRS salesperson performance is measured based on, *inter alia*, "[o]utbound calls," and not faxes sent); Fromhoff Depo., at 27 (KRS "protocol" was to obtain consent by phone or email prior to sending faxes); *id.* at 44 ("***It's our policy to request permission to send***.") (emphasis added); *id.* at 16 ("General rule is we go to a number of trade shows. ***We call*** offices and doctors and hospitals and whatnot, surgical centers, ***asking them if they would be interested in our***

*product*. And ***they – the end user, the business would request information, either via e-mail or via fax***.) (emphasis added); *id.* at 23 ("I know that people [customers or potential customers] would say, 'Hey, can you send me material?' . . . 'Can you fax it to me?'"); *see also id.* at 19.

However, KRS records do not reflect which members of its contact list have solicited marketing materials or those who have consented to receive faxes.  *See* Suer Depo., at 41.  KRS has no way to determine which recipients solicited materials or consented to receive them by fax.  *See* Fromhoff Depo., at 26, 27-28, 43.  Further, because RingCentral's records to not segregate which employee sent which fax through the system, KRS (and RingCentral) has no way to determine which employee is responsible for sending any particular fax, and there is no way to know whom to ask about obtaining consent.  Fromhoff Depo., at 13, 16, 20-21

All categories on the KRS contact list were sent marketing materials in the same ways, including sometimes by fax. *See* Suer Depo., at 53-54. When KRS representatives sent materials by fax, they did so using KRS's own contact list, and KRS's own facilities; KRS "never hired some third party to transmit faxes on its behalf." Fromhoff Depo., at 25. When faxing contacts, KRS salespersons would either place material in one of KRS's six or seven fax machines to send it, or send it through their computer using KRS's telecommunications provider, RingCentral. *See* Suer Depo., at 54-56; Fromhoff Depo., at 9.  Finally, KRS salespersons typically faxed promotional materials to their established "customer base."  Fromhoff Depo., at 13. KRS never sent out advertisements to its entire customer list.  *See id.* at 23.  Instead, KRS typically sent product-specific materials by fax, electronic mail, or "snail" mail to "people that requested it . . . doctors in our list [that] they want to receive a fax."  *Id.*

Summing KRS faxing practices up, Mr. Fromhoff answered affirmatively ("Correct") when plaintiff's counsel asked:  "And it's your understanding that [marketing flyers, such as the

one at issue in this case] would be transmitted to a potential customer or actual customer by facsimile because a customer requested them, generally?" *Id.* at 23.

As noted, KRS telecommunications services, phone and fax, are provided by RingCentral. In this case, RingCentral produced a "transmission log," detailing phone calls made and received and faxes sent and received by KRS during the period spanning September 9, 2015 to September 6, 2016. Fromhoff Depo., at 9-10, 12. While this log indicates fax numbers that were successfully reached, it does not indicate what document or material was faxed to those numbers. *Id.* at 25. KRS uses the same fax numbers to send all its fax transmissions, including marketing materials, and also business communications and pharmacy-related information, such" prescription confirmations." *See, e.g.,* Fromhoff Depo., at 35. As noted, KRS has no way to determine what was faxed to any particular number at any particular time. *Id.*, at 24-25. No software used by KRS or RingCentral tracks what faxes were sent to what numbers. Suer Depo., at 34. Specifically, as it pertains to this case, there is no way to track when, or to whom the IV Infusion marketing was faxed. *Id.*

That said, KRS has admitted it faxed the IV Infusion marketing flyer to the plaintiff in this case, William Sawyer, and has not contested Mr. Sawyer's claims that "he has no recollection of ever communicating with anyone from KRS Global," and that he did not give KRS Global permission to fax the IV Infusion marketing flyer. As such, KRS has admitted TCPA liability with regard to Mr. Sawyer.

At the same time, KRS has vigorously maintained that Mr. Sawyer, and the method by which he received a fax from KRS, represents an exception to KRS's general practice, and is not typical of how KRS promotes its products. KRS from the outset has maintained that it typically faxes materials primarily to its established customers and to those parties who solicit or consent

to receive marketing materials. Nevertheless, plaintiff and plaintiff's counsel now seek certification of a class. They have defined their proposed class as follows:

> All subscribers of accounts (or other persons/entities) associated with the (1) fax numbers listed in the RingCentral spreadsheet (2) that were successfully sent a fax from KRS Global Biotechnology; (3) from the phone number (888) 502-2050; (4) with a "start time" of October 8, 2015 or October 9, 2015.

*See* Motion, at 11. According to plaintiff: "The proposed class consists of 34,773 persons/entities and can be ascertained entirely from the RingCentral spreadsheet." *Id.*

While plaintiff's Motion makes clear that its proposed class includes only recipients of "unsolicited" advertisements purportedly sent via facsimile by KRS – as solicited faxes are not a violation of the TCPA – plaintiff makes no serious effort to address the clear fact that nothing establishes its innuendo that KRS sent even a single "unsolicited" fax other than the one the plaintiff received. Plaintiff and its counsel attempt to mislead this Court as to the evidence adduced in discovery, and as to the relevant, controlling law on class certification.

With regard to plaintiff's factual deception, plaintiff, through counsel, attempts to obfuscate that all the available evidence shows that KRS sent marketing materials by fax overwhelmingly to established customers and prospective customers who solicited or consented to receive such materials by fax. Plaintiff's (and plaintiff's counsel's) desperate attempt to establish a class by deception and obfuscation can be seen in plaintiff's unfairly skewed presentation of the facts. For example, plaintiff takes the deposition testimony of Mr. Suer, KRS's Vice-President of Sales, completely out of context in order to paint an inaccurate picture they obviously think will support their plea for class certification. Thus, in their Motion, they purport to quote from the deposition of Mr. Suer, as follows:

> IV infusion is trending. It's a trending procedure that a lot of physicians are looking to get into. So, therefore, we reached out to as many physicians that we can possibly contact on a daily basis, pitch them our product, product line, actually, for IV infusion

and . . . send them over this marketing flyer, Exhibit 1, as you guys would call it.

Motion, at 4. The purpose of this excerpt is clearly to convey to this Court that the KRS sales

team attempted to pitch "as many physicians" as possible "on a daily basis" by "send[ing] them

over this marketing flyer." However, that is not Mr. Suer's testimony, plaintiff's counsel is well

aware of that, and yet chose to use an ellipsis in an effort to change the meaning of Mr. Suer's

testimony to plaintiff's purpose.  In fact, as noted above, Mr. Suer actually testified as follows:

> So, therefore, we reached out to as many physicians that we can possibly contact on a
> daily basis, pitch them our product, product line, actually, for IV infusion and ***then we
> would*** send them over this marketing flyer, Exhibit 1, as you guys would call it."

Suer Depo., at 34 (emphasis added).  The clear import of Mr. Suer actual testimony is

that KRS sales represented contacted as many physicians as possible by phone, discover

who was interested in KRS IV infusion products and asked for more information, "and

then [they] would send over this marketing flyer."  Equally clear is that plaintiff and its

counsel omitted the words "then we would" before "send them over this marketing flyer,"

in a naked attempt to mislead this Court that KRS sales team members were sending

"unsolicited" faxes when they weren't, in an effort to bolster their baseless claim for class

certification and falsely create a class that does not really exist.

Mr. Suer's actual testimony, as opposed to the acontextual portion plaintiff

attempts to pass off, is consistent that KRS sales team representatives typically and

regularly made efforts "to get permission from people before sending marketing flyers to

their fax machine," pursuant to their "policy," "protocol," and "general rule." *See infra*, at

2-3.[1] Instead of confronting and explaining this repeated and consistent testimonial

---

[1] Plaintiff's counsel's attempted to twist the other similar evidence. Instead of respecting Mr. Suer's
testimony explaining that KRS believed sending hard copy materials by fax or email after speaking to a
customer or potential customer by phone and obtaining consent, *see* Suer Depo., at 40-41, plaintiff's
counsel attempts to mislead this Court hiding the context of Mr. Suer's testimony, and instead quoting only

evidence – they ignore most of Mr. Fromhoff's clear explanations of KRS marketing and faxing procedures, presumably, because they completely undermine class certification[2] – plaintiff's counsel chooses to try to twist it or hide it from this Court.

Further, in an apparent effort to address the ascertainability of potential class member and necessary proof, plaintiff states that "[t]he transmission log," produced by KRS, "contains detailed information concerning each fax transmission sent or received by KRS Global," for example, noting the log shows dates of transmissions, the origin and destination fax numbers, and whether fax transmissions were successful. *See* Motion, at 8. While the transmission log contains some details, importantly, it contains ***no information whatever about what was faxed to and from the numbers listed***. Plaintiff leaves this information out, and thereby creates a false impression that the fax transmission logs in this case reflect *what was sent* by KRS, when, in fact, they do not.[3]

The only clear evidence in this case is the number of faxes that KRS sent on particular days, the number of those faxes that were successfully received, and the fax numbers of the recipients. It is equally clear that there is no way to determine what was

---

the question and answer that immediately follow Mr. Suer's clear explanation, excerpting in the Motion, at 4: "Q. Okay. So marketing flyers sent to people's facsimiles are an effective way of marketing from KRS Global's standpoint? A. Yes." Here, again, plaintiff and its counsel are attempting to contort an innocent answer indicating KRS regularly obtained consent and authorization to send marketing facsimiles into illicit conduct to support its desperate wish for class certification.

[2] Bruce Fromhoff testified, *inter alia*, that: (1) KRS did not buy and lists of fax numbers from third parties or obtain fax numbers for customers or potential customers in any impermissible way, Fromhoff Depo., at 16; (2) days when a KRS sent a larger number of faxes probably represents KRS salespersons sending news of "special" products to "their customer base," *id.*, at 13-14; (3) KRS's "policy" and "protocol" was to phone potential customers to obtain consent before sending marketing materials by fax, *id.* at 16, 27, 44.

[3] Elsewhere, in an apparent effort to create the impression of the largest putative class possible, plaintiff and its counsel rely on KRS's admission that it sent the fax at issue here – the so-called, "IV Infusion Fax" – "to more than 1,000 persons" or "to more than 1,000 telephone numbers." *See* Class Certification Motion, at 13 & n.29 (citing to KRS's Response To Plaintiff's Request For Admissions, at ¶¶ 6, 10). Plaintiff fails to account for the fact that, KRS's representation that could not admit or deny whether it sent the marketing flyer to more than 5,000 numbers, and KRS's denial that it sent it to more than 10,000. No evidence contradicted this evidence. That means between approximately 27,000 and 36,000 of the recipients in plaintiff's putative class did not receive the IV Infusion marketing flyer that is the subject of this lawsuit.

faxed to those number, which KRS employee sent the fax, and which of the recipients

explicitly solicited the faxes or consented to receive them pursuant to KRS's policy of

obtaining consent by phone prior to faxing. As such, the "34,773 persons/ entities" that

plaintiff attempts to cram into its class really fall into at least four categories, as follows:

> 1.  Business-related faxes, and prescription-related faxes that are not advertisements sent to established business relationships, solicited or not. **Not a violation of the TCPA.**

> 2.  Advertisements that are solicited by either established business relationship or new potential customer. **Not a violation of the TCPA.**

> 3.  Advertisements that are not solicited that meet the requirements of the TCPA, i.e., fax numbers obtained from marketing materials or publicly available listings that contain the proper opt-out language. **Not a violation of the TCPA.**

> 4.  Advertisements that are not solicited that do not meet the requirements of the TCPA or Junk Fax law. **A violation.**

The record evidence in this case shows that plaintiff has established exactly one fax in Category

4 was sent by KRS.[4]  In short, the clear facts of this case demonstrate that plaintiff's proposed

class cannot qualify under Rule 23 and the applicable law governing its application.

## DISCUSSION

"'The class action is an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Sandusky Wellness Center, Inc. v. ASD Specialty*

*Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564

---

[4] In plaintiff's Motion, in an effort to try to find a second exemplar of an improper KRS fax, plaintiff claims the IV Infusion marketing flyer was also sent to "ARCare, Inc., a medical facility in Arkansas." Motion, at 11 & n. 22. This claim is not based on any evidence adduced in this case, and instead is based on a documents pertaining to a voluntarily dismissed lawsuit previously filed against KRS in Florida.  In September 2016, KRS identified to plaintiff, the *ARCare, Inc. v. KRS Global Biotechnology, Inc.,* Case No. 16-80574, filed in the U.S. District Court for the Southern District of Florida.  Counsel for the plaintiff knew of this case for over a year at the time they filed the present Motion.  Nevertheless, plaintiff's counsel undertook no effort at all to contact the plaintiff or the attorney in that case to verify any of the circumstances underlying that suit.  If they had, they would have learned that the case was voluntarily dismissed by the plaintiff without any payment or settlement by KRS. In any event, without corroborating testimony explaining it, the complaint in that case and its attachment do not constitute evidence in this case.  Plaintiff's failure to develop facts from that case, or choice to avoid dealing with the facts favorable to KRS that developed after its filing bars plaintiff from relying on them here.

U.S. 338, 348 (2011) (internal quotation marks omitted).  In order to justify certification of a

putative class, a plaintiff moving for certification must establish the four requirements of Rule

23(a) – numerosity, commonality, typicality, and adequate representation – in addition to

establishing the purported class fits into one of the three types identified in Rule 23(b).  *Sandusky*

*Wellness*, 863 F.3d at 466.  As relevant here, Rule 23(b)(3) requires the plaintiff to establish (1)

"that the questions of law or fact common to class members predominate over any questions

affecting only individual members," and (2) that class treatment is "superior to other available

methods."  *See* Fed. R. Civ. P. 23(b)(3); *Sandusky Wellness*, 863 F.3d at 466.

"The predominance requirement of Rule 23(b)(3), though redolent of the commonality

requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes

are sufficiently cohesive to warrant adjudication by representation.'"  *Gene & Gene, LLC v.*

*BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quoting *Amchem Prods. Inc. v. Windsor*, 521

U.S. 591, 623-24 (1997)). According to Sixth Circuit:

> The rule provides that "questions of law or fact common to class members must
> predominate over any questions affecting only individual members."  In discerning
> whether a putative class meets the predominance inquiry courts are to assess "the
> legal or factual questions that qualify each class member's case as a genuine
> controversy," *Amchem Prods* . . ., 521 U.S. [at] 623 . . . , and assess whether those
> questions are "subject to generalized proof, and thus applicable to the class as a
> whole," *Bridging Cmtys., Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir.
> 2016) (internal citation omitted).  "If the same evidence will suffice for each member
> to make a prima facie showing, then it becomes a common question." [citation
> omitted]. Plaintiffs need not prove that every element can be established by classwide
> proof.  *Bridging Cmtys.*, 843 F.3d at 1124.  But the key is to "identify[] the
> substantive issues that will control the outcome," in other words, courts should
> "consider how a trial on the merits would be conducted if a class were certified."
> *Gene & Gene* . . . , 541 F.3d [at] 326 . . . (quotation marks omitted).

*Sandusky Wellness*, 863 F.3d at 468 (holding: "Not only was the district court correct to identify

consent as presenting individualized questions, such questions were sufficient to keep common

questions from predominating and preclude certification under Rule 23(b)(3).");  *Gene & Gene*,

541 F.3d at 328 (regarding predominance "plaintiffs must advance a viable theory employing generalized proof to establish liability with respect to the class involved, and . . . district courts must only certify class actions filed under the TCPA when such a theory has been advanced.").

"It is the party seeking class certification – here, [plaintiff] – that bears the burden of 'affirmatively demonstrate[ing]' compliance with Rule 23." *Sandusky Wellness*, 863 F.3d at 466 (quoting *Wal-Mart*, 564 U.S. at 350); *see also Gene & Gene.*, 541 F.3d at 329 ("To be sure, the burden is on [plaintiff] to show that the requirements for class certification are satisfied").

Applying these standards in the specific context of a plaintiff seeking certification of a class in a TCPA suit, and defense claims that members of putative class consented to receipt, the Sixth Circuit has drawn clear lines delineating when certification is warranted.  Specifically, this year, in *Sandusky Wellness*, the Sixth Circuit synthesized its law on this issue and held that while a defendant's "'mere mention of a defense,'" or the "'possibility'" that "'individual class members *might* have solicited or consented to receiving the challenged faxes'" will not be "'enough to defeat the predominance requirement of Rule 23(b)(3),'" when a defendant "has produced concrete evidence of consent" class certification is inappropriate. 863 F.3d at 469 (quoting *Bridging Cmtys., Inc.*, 843 F.3d at 1124)

In *Sandusky Wellness*, the Sixth Circuit affirmed the district court's denial of class certification even though the defendant there "us[ed] fax numbers obtained from third party data provider, InfoUSA," because evidence showed that mixed among the recipients of the defendant's more than 40,000 faxes were many who may had consented to receive the faxes. 863 F.3d at 469.  Thus, according to the Sixth Circuit, because the defendant "presented actual evidence of consent to the district court," the district court properly denied class certification because "the need for individualized inquiries in order to distinguish between solicited and

unsolicited . . . faxes" would have led to "myriad minitrials," required a "painstaking sorting process," and completely defeated the plaintiff's effort to establish predominance under Rule 23(b)(3). *Id.* at 470; *id.* at 468 ("if Sandusky's 40,343-member class were certified, the district court would be tasked with filtering out those members to whom [defendant] was not liable – those individuals who solicited the [allegedly improper] fax."). "Regardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation." *Id.* (citing *Gene & Gene*, 541 F.3d at 326). In the words of the *Sandusky Wellness* court, the "'one substantive issue'" that would "'undoubtedly . . . determine how a trial on the merits [would] be conducted if the proposed class [were] certified,'" was "'whether [defendant's] fax advertisements were transmitted without the prior express invitation or permission of each recipient,'" thus "'the predominant issue of fact is undoubtedly one of *individual* consent.'" *Sandusky*, 863 F.3d at 468 (quoting *Gene & Gene*, 541 F.3d at 327).

As is readily apparent, in reaching its conclusion that class certification was improper, the *Sandusky Wellness* court repeatedly relied on the well-reasoned Fifth Circuit case *Gene & Gene*. (The *Sandusky Wellness* court cited *Gene & Gene* half a dozen times.) In *Gene & Gene*, the Fifth Circuit held the district court had abused its discretion in certifying the plaintiff's proposed class of fax recipients because the record evidence of some consenting fax recipients among the putative class rendered "[t]he distinction between consenting and non-consenting recipients . . . the primary issue before the district court in the class-certification dispute." *Id.* at 321-22. In short, the *Gene & Gene* court agreed with defendant BioPay's argument "that determining whether the recipient of each fax had consented to its transmission would require a series of individual factual determinations, or mini-trials, which made class certification improper." *Id.*

*Sandusky Wellness*, and the *Gene & Gene* opinion on which it relies so heavily, make

clear that the specific factual context is essential to comprehending precedent and to using it as a guidepost. *Gene*, 541 F.3d at 328 ("the unique facts of each case generally will determine whether certification is proper"). Thus, the facts of each case must be examined in detail.

In *Sandusky Wellness*, the plaintiff identified a putative class of 40,343 members who received a one-page fax advertisement for a drug called Prolia from the defendant, "Besse." *See* 863 F.3d at 463. Besse "purchased a list of physician contact information from InfoUSA, a third-party data provider," and later learned that some of the physicians on the list "happened to be current or former customers." *Id.* at 464-65. After culling the list, Besse employed "WestFax, a fax broadcaster [to] transmit[] the Prolia fax on Besse's behalf." *Id.* at 465. During discovery, "Besse had produced considerable evidence indicating that at least some intended Prolia fax recipients had indeed solicited the fax." *Id.* Specifically, evidence in the form of a declaration of Eric Besse indicated that "'several thousand' individuals on the Prolia List of intended fax recipients are 'current or former Besse customers,' and that Besse had "over 450,000 pages of various forms where customers had provided Besse with their fax numbers." *Id.* at 468.

Ignoring the fact that the 40,343 Prolia fax recipients comprised a group of former customers of Besse, current customer of Besse, and entities or individuals wholly unknown to Besse, the plaintiff "sought certification of a putative class comprising all 40,343 persons who also allegedly received the fax. In Sandusky's view, Besse was liable to this whole lot, with no need to distinguish between which faxes were unsolicited and which were solicited." *Id.* at 465. The district court found that because the fax list comprised a mix of individuals who were former or current customer – i.e., those who had consented to receive faxes – and those obtained from the purchased list of names, determining who had consented and who had not would be an "individualized inquiry that made class certification improper." *Id.* at 466.

The Sixth Circuit agreed, holding the district court had correctly denied class certification "[b]ecause Besse presented actual evidence of consent to the district court, which required the need for individualized inquiries in order to distinguish between solicited and unsolicited Prolia faxes . . . ." *Id.* at 470; *see id.* at 468 ("Regardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation."). The Sixth Circuit distinguished *Siding & Insulation Co. v. Combined Ins. Grp. Ltd.*, No. 1:11-CV-1062, 2012 WL 1425093 (N.D. Ohio 2012), because there, unlike in *Sandusky Wellness*, "there was 'nothing in the record to support the claim that any of the recipients consented to receiving the fax.' *Id.* at *3. Therefore, in that case it may very well have been reasonable for the court to assume a universal lack of consent." 863 F.3d at 469.

In *Gene & Gene*, the defendant BioPay had "admitted that it purchased databases that included the contact information of potential customers," and "admitted that it culled fax numbers from these databases." *Id.* at 323. "BioPay, however, [had] produced evidence that it also *periodically* culled fax numbers from other sources—from information submitted by merchants through BioPay's website, from information submitted at trade shows BioPay attended, and also from lists of companies with which BioPay or its affiliates had an established business relationship." *Id.* As such, BioPay contended that a "significant number of the faxes it sent were consented to by the recipients." *Id.* The testimony in that case indicated that BioPay's "database entries do not consistently or accurately reflect whether a given recipient had consented to receive fax advertisements," because BioPay did not record such information about consent during the relevant period," and when BioPay did record such information it did so "only with sporadic and therefore unreliable consistency." *Id.*

There, in the light of the evidence, the plaintiff "Gene" argued "that it is irrelevant that

BioPay culled fax numbers from a variety of sources, as Biopay [sic], according to Gene, bears the burden of proving consent and has not retained the necessary documents or records to meet this burden." *Id.* Rejecting plaintiff's argument, and finding the district court abused its discretion in certifying the putative class, the Fifth Circuit "emphasize[d] that it is the party seeking certification that bears the burden of establishing that the requirements of Rule 23 have been met," and also "emphasize[d] that district courts must conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." *Id.* Regardless whether consent of fax recipients is characterized as an affirmative defense or an element the plaintiff must establish, the court held, if the issue of consent will "determine how the proposed class-action trial will be conducted on the merits," such a bona fide issue of consent must defeat class certification. *Id.* at 328 (citing *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 402 (E.D. Pa. 1995) (denying class certification because plaintiff failed to establish predominance in "junk fax" case where consent was at issue); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F.Supp. 1162, 1169-70 (S.D. Ind. 1997) ("denying class certification because consent would have to be proven via individual inquiries as to each class member"); *Levitt v. Fax.com*, 2007 WL 3169078, at *4-*7 (D. Md. May 25, 2007) ("same")).

By way of contrast, the *Gene & Gene* court identified "junk fax" cases where individualized questions of consent did not undermine plaintiff's predominance showing and did not defeat class certification.  Specifically, the court discussed *Kavu v. Omnipak Corp.*, 246 F.R.D. 642, 645 (W.D. Wash. 2007), where the district court had determined "that in its case the question of consent would not require 'individual evidence,'" because the defendant there "had obtained all of the fax recipients' fax numbers from a single purveyor of such information and . . . [plaintiff] was able to propose a novel, class-wide means of establishing the lack of consent based on arguably applicable federal regulations" that require a fax sender who obtains fax

numbers from a commercial database to take "reasonable steps to verify that the recipient agreed to make the number available for distribution." *Gene & Gene*, 541 F.3d at 327-28 (first quotation from *Kavu*, 246 F.R.D. at 645; second quotation from 47 C.F.R. § 64.1200(a)(3)(ii)(B)).

The law in this Circuit, and that from federal and state courts around the country, coalesces into a straightforward rule to determine whether class certification is appropriate in a TCPA case implicating consent issues: If the evidence indicates a *bona fide* question whether some of the putative class members consented to receipt of the subject faxes – as opposed to mere speculation about a defense centered on consent – class certification is not appropriate.

Applicable precedent teaches further that the most common instances when a plaintiff class is appropriate in a TCPA case is when the defendant purchased a list of contact numbers from a third party and uses a fax broadcaster to transmit faxes to those purchased numbers. *See Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 443-44, 446 (N.D. Ohio 2012) (distinguishing *Gene & Gene* and finding "no questions of individualized consent" where defendant purchased a database of fax numbers of more than 16,000 recipients from InfoUSA, and hired a "fax broadcaster," Business to Business Solutions ("B2B"), and where defendant "has presented no evidence that it had established business relationships with any of the more than 16,000 recipients of its faxes");[5] *Bridging Cmtys.*, 843 F.3d at 1122, 1126 (holding denial of class certification was abuse of discretion where B2B sent more than 4,000 faxes on behalf of defendant using "a list of fax numbers purchased from a company called InfoUSA, Inc.," and where plaintiff presented "class-wide evidence . . . showing an absence of consent");

---

[5] Plaintiff relies heavily on *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, arguing the facts of that case were "very similar" to those of this case, thus support a finding of commonality and typicality, here. *See* Motion, at 14-16. As is typical in its Motion, plaintiff omits the key factual differences between *Beachwood Hair* and this case – namely, that the defendant in *Beachwood Hair* purchased a list of fax numbers from a commercial database and used a fax broadcaster, B2B, whereas here, KRS used its own customer database developed in-house and transmitted faxes itself through its normal telecommunications provider – and, perhaps more important, ignores the recent clear Sixth Circuit decision of *Sandusky Wellness*, which address in detail the precise issues now before this Court.

*Kavu*, 246 F.R.D. at 647 ("Notably, whether the facsimile was 'unsolicited' appears to be more of a common issue in this case than in the cases that denied class certification. Omnipak . . . obtained all of the recipients' facsimile numbers [3,000 of them] from the Manufacturers' News database [a third party] . . . . Therefore, whether recipients' inclusion in the Manufacturers' News database constitutes express permission to receive advertisements via facsimile is a common issue"); *Siding & Insulation Co. v. Combined Ins. Grp.,* No. 1:11 CV 1062, 2012 WL 1425093, at *1 (N.D. Ohio Apr. 24, 2012) (defendant's "faxes were sent by a fax broadcaster, [B2B], hired by Defendant. . . . B2B used a third-party database acquired from InfoUSA to identify targets for Defendant's faxes. Defendant concedes that B2B, acting on Defendant's behalf, faxed the advertisements to the targets listed in the InfoUSA database."); *Michel v. WM Healthcare Sols., Inc.*, No. 1:10-CV-638, 2014 WL 497031, at *8 (S.D. Ohio Feb. 7, 2014) (attorneys for plaintiff in this case had class action settlement approved by this Court; this Court found predominance satisfied where third party, "SK & A," had "compiled lists of fax numbers used by medical professionals and sold [defendant] a license to use those lists for advertising purposes," and "SK & A transmitted [defendant's] advertisements to Class Members based upon those lists").

Here, the evidence adduced in discovery demonstrates unequivocally that plaintiff has failed to carry his burden to establish Rule 23's predominance requirement.[6] Here, as in *Gene &*

---

[6] While individual factual and legal issues concerning (1) which recipients of KRS's faxes received advertisements, (2) which recipients received other business materials or prescription-related information, (3) which recipients solicited or consented to receive advertising materials by fax, (4) and, which advertising faxes were sent to KRS, relate to the commonality, typicality, and numerosity requirements of Rule 23(a), because Rule 23(b)(3)'s predominance inquiry imposes a more exacting burden on plaintiff in order to establish a class, KRS's arguments are directed primarily at the predominance question. Here, KRS specifically contends plaintiff has failed to meet its burden on the Rule 23(a) factors because evidence shows an overwhelming majority of plaintiff's putative class consented to receive KRS's faxes, or otherwise received faxes in conformance with the TCPA, and thus plaintiff has failed to establish its claim is typical of the class, or that the putative class is sufficiently large, or that common issues of fact will apply. By way of example, Plaintiff's mistaken assumptions nowhere undermine its argument for class certification more than in its discussion of the issue of commonality. Plaintiff asserts: "The alleged wrongdoing in this case consists of transmitting an identical advertisement to thousands of fax numbers/fax machines in violation of the JFPA. As a federal law, the JFPA is common to all of the potential class members regardless of where they are located. Accordingly, the recipients have all suffered the same injury and will all be

*Gene*, "the evidence shows that some of the fax advertisements . . . sent were solicited by the recipients, but which ones can only be decided on a case-by-case basis."  *See* 541 F.3d at 328. Here however, unlike in *Gene & Gene* and *Sandusky Wellness*, and all the cases cited in the preceding paragraph, there is no evidence whatsoever that KRS "purchased databases" from anyone or used a fax blaster services. *See Gene & Gene*, 541 F.3d at 328 ("the evidence shows that BioPay [defendant] culled fax numbers from purchased databases but also periodically culled fax numbers from various other sources"); *Sandusky Wellness*, 863 F.3d at 464 (defendant "purchased a list of physician contact information from InfoUSA, a third-party data provider").

Here, as in *Gene & Gene* and *Sandusky Wellness*, discovery has produced some "records" relating to "the faxes that were successfully sent," and the defendant, here KRS, has "produce[d] unrefuted testimony that its database entries do not consistently or accurately reflect whether a given recipient had consented to receive fax advertisements."  *Gene & Gene*, 541 F.3d at 328; *Sandusky Wellness*, 863 F.3d at 470 (defendant "presented actual evidence of consent to the district court"); *see infra*, at 2-4.  Just as in *Gene & Gene*, here, defendant's "employees testified . . . that there is no class-wide basis for distinguishing which recipients gave consent and which did not," and "[t]his evidence was not contradicted."  *Gene & Gene*, 541 F.3d at 329. Thus, just as in *Gene & Gene*, "because the evidence shows that the recipients' fax numbers were collected over time and from a variety of sources, individual inquiries of the recipients are necessary to sort out which transmission was consented to and which was not," and "there is no class-wide proof available to decide consent and only mini-trials can determine this issue." 541 F.3d at 328-29.  Moreover, in this case, the evidence shows there is no way even to identify what documents

---

entitled to the same damages; [sic] *i.e.,* the statutory damages under the JFPA."  Motion, at 14.  Here, again, plaintiff and its counsel completely ignore the fact that (1) no recipient who received something that was not an advertisement, and (2) no recipient who authorized or solicited KRS to fax marketing materials can possibly be entitled to any damages, thus cannot possibly be part of any class.

were sent by fax to each of the recipients in plaintiff's proposed class.

Further, just as in *Gene & Gene*, the fact that the defendant – here, KRS – "sent its fax advertisements in accordance with the same procedure" – here, through fax software provided by its telecommunications provider, RingCentral – "is not necessarily determinative of whether class-wide proof is available to establish consent." *Id.* at 329. Like in *Sandusky Wellness* and *Gene & Gene*, and as distinguished from cases cited, *infra*, at 17-18, here, the defendant did not obtain fax numbers from a "single-source contact list," but instead "culled fax numbers from a variety of sources over a period of time, such that class-wide proof of consent is not possible."

In short, the arbitrary class identified by plaintiff fails entirely to account for a key component of the TCPA: namely, that no reliable evidence adduced during discovery – when plaintiff had a full opportunity to develop any relevant facts to support its claims – establishes that the members of the plaintiff's proposed class did not solicit, request, or otherwise authorize receipt of KRS faxes. Throughout his Motion, plaintiff fails to address or differentiate recipients of KRS fax transmissions who had requested or authorized KRS to send faxes. Instead, in the teeth of the facts, plaintiff and his counsel – in an effort to serve its present purpose of maintaining a class action lawsuit and assembling as large a class as possible – prefer to simply assume that any successful fax sent by KRS must have been an advertisement, must have been unsolicited, and must have been to a new contact, instead of an established KRS customer.[7]

Again, this is not a case where any evidence indicates KRS bought lists of fax numbers, hired a "fax broadcaster," or otherwise built its customer database by illegal or improper

---

[7] As an example, plaintiff attempts to rely on KRS's admission that it "sent the IV Infusion Fax to over one thousand persons and telephone numbers," Motion, at 13 & n.29, to support its argument on numerosity, while all the time ignoring that all of the recipients of the "IV Infusion Fax" who authorized KRS to send it to them must be excluded from the class because sending the fax with consent simply is not a violation of the TCPA. Similarly, the fact that KRS may have sent successfully 34,773 faxes on October 8 and 9, 2015, cannot establish the numerosity element for plaintiff, where no evidence supports a conclusion that these fax transmissions were not to existing customers or potential new customers who had solicited marketing materials on KRS's IV infusion kits.

practices.  On the contrary, the evidence here indicates that KRS established its database the old-fashioned way, by working the phones and pounding the pavement; and, the evidence indicates that KRS salespersons regularly used their customer databases – not lists of purchased numbers – to contact existing customers with product information. *See, infra*, at 1-3.

Finally, Rule 23(a)(4) and (g)(1)(a) place in issue here, plaintiff's counsel's experience in handling class actions and knowledge of the applicable law.  While there is no dispute that plaintiff's counsel has been filing class action cases for more than a decade, this Court must question plaintiff's counsel's adequacy based on their unfair manipulation of the evidence adduced in discovery in this case and their ignoring plainly applicable and controlling Sixth Circuit law governing class certification – this is especially troubling in the light of the fact that attorney for plaintiff was counsel in *Sandusky Wellness*, the very Sixth Circuit case controlling here, which is never once cited in plaintiff's present Motion or listed in attorney Matthew Stubbs's accompanying Declaration listing class action cases in which he has participated.

In particular, plaintiff's counsel's entire predominance argument, besides being utterly unconvincing, evinces either a woeful lack of knowledge of applicable law or a deliberate attempt to hide plainly applicable, controlling law and mislead this Court.  This may well be a violation of the duty to disclose known adverse authority.  *See* Ohio Prof. Cond. Rule 3.3(a)(2). From the outset of this case KRS informed plaintiff's counsel that KRS records do "not identify the actual document sent via facsimile nor does it identify a sender.  KRS sends numerous facsimiles that are not advertisements ***as well as numerous documents specifically requested by customers***.  Additionally, KRS sends facsimiles to business associates, vendors, and entities non-related to pharmacy." KRS Interrogatory Responses, at 2-3 (emphasis added); KRS Response to Request For Admissions, at ¶¶ 6, 10 (same); *see, infra*, at 2-3 (repeated deposition testimony of

19

Suer and Fromhoff to same effect). As such, counsel for plaintiff was well aware throughout the discovery period that consent to receive faxes (and prior business relationship issues) would be a central to any request for class certification.  Moreover, because plaintiff's counsel was "On Brief" for the appellant in the Sixth Circuit case *Sandusky Wellness*, *see* 863 F.3d at 462, there can be no question that plaintiff's counsel knew of the detailed holding of *Sandusky Wellness*, and its clear applicability here, harmful as it may be to their desired outcome on their Motion.

In sum, "[w]hile class certification may be normal under the TCPA, that does not mean it is automatic.  While there may be several benefits to affording TCPA cases class treatment . . . those benefits do not always outweigh the difficulties of managing a proposed class." *Sandusky Wellness*, 863 F.3d at 470, 473.  In a TCPA case, as in all cases, "it is the party seeking class certification – here, [plaintiff] – that bears the burden of affirmatively demonstrate[ing] compliance with Rule 23." *Id.* at 466.  Here, plaintiff has utterly failed to meet its burden.  The evidence here shows that if plaintiff's putative class is certified,"the need for individualized inquiries in order to distinguish between solicited and unsolicited . . . faxes" would lead inevitably to "myriad minitrials," requiring a "painstaking sorting process." *Id.* at 470; *id.* at 465-66 ("weeding out the solicited from the unsolicited fax recipients . . . would require . . . another individualized inquiry that made class certification improper."). Moreover, individualized inquiries into who received what materials by fax – with apparently no way to ascertain these "facts," and providing an independent basis to deny class certification – would require similar minitrials and a similar "painstaking sorting process."  As such, plaintiff has failed to establish predominance under Rule 23(b)(3), as well as the commonality, typicality, and numerosity prongs of Rule 23(a), and class certification is inappropriate here.

**WHEREFORE**, for the reasons state, this Court should deny plaintiff's Motion.

Respectfully submitted,

/s/ Richard R. Parsons
Richard R. Parsons, Trial Attorney (0082270)
Paula Brown, (0043897)
KRAVITZ, BROWN & DORTCH, LLC
65 E. State Street, Suite 200
Columbus, Ohio 43215
Telephone:     (614) 464-2000
Facsimile:     (614) 464-2002
Email:         rparsons@kravitzllc.com

/s/ Sean M. Ellsworth
Sean M. Ellsworth (admitted *pro hac vice*)
Florida Bar No. 39845
ELLSWORTH LAW FIRM, P.A.
420 Lincoln Road, Suite 601
Miami Beach, Florida 33139
Telephone: (305) 535-2529
Facsimile: (305) 535-2881
sean@ellslaw.com

*Attorneys for Defendant*
*KRS GLOBAL BIOTECHNOLOGY, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed and served electronically via the Court's CM/ECF system on November 2, 2017, which will send notification to all attorneys registered to receive such service.  A copy of the forgoing was sent by first-class mail, postage prepaid, to any parties not registered with the CM/ECF system.

/s/ Richard R. Parsons
Richard R. Parsons