**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

WILLIAM P. SAWYER d/b/a
SHARONVILLE FAMILY MEDICINE,                    Case No. 1:16-cv-550

                    Plaintiff,                             Dlott, J.
        v.                                                 Bowman, M.J.

KRS BIOTECHNOLOGY, INC., et al.,

                    Defendants.

## REPORT AND RECOMMENDATION

Plaintiff filed this case against Defendant as a putative class action under the "junk fax" provision of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227(b)(1)(C). On March 29, 2018, the presiding district judge referred all pretrial and post-judgment motions and procedures to the undersigned magistrate judge. (Doc. 31).

Currently pending is Plaintiff's motion for class certification, pursuant to Rule 23, Fed. R. Civ. P. Counsel presented oral argument at a hearing held on May 14, 2018. For the reasons that follow, the undersigned now recommends that Plaintiff's motion be DENIED.

## I.    Background

Plaintiff William Sawyer, M.D., d/b/a as Sharonville Family Medicine ("Sawyer"), is a primary care practice located in Sharonville, Ohio. Plaintiff has a telephone number that is used to receive faxes. Defendant KRS Biotechnology, Inc. ("KRS") is a Florida compounding pharmacy with nearly 90 employees and a principal place of business in

Boca Raton, Florida. Defendant KRS[1] sent an unsolicited one-page advertisement to Sharonville Family Medicine on October 9, 2015. The fax promoted KRS's IV infusion sets and/or other products and services ("Infusion Kit Fax"). (Doc. 1 at ¶¶3, 14). Defendant admits that KRS and Sawyer had no prior business relationship, and that KRS did not seek or obtain permission from Sharonville Family Medicine to send the Infusion Kit Fax prior to doing so. Although Defendant admits TCPA liability with regard to Plaintiff Sawyer (Doc. 24 at 5), it maintains that the fax sent to Sawyer was in violation of KRS's established business practices, and vigorously disputes the allegation that it sent any unsolicited faxes to anyone other than Sawyer.

KRS's telecommunications services provider in October 2015 was called RingCentral. In response to a subpoena, RingCentral produced KRS's call and fax log data in the form of an excel spreadsheet. The fax log contains information concerning the number of fax transmissions, the phone numbers dialed, and whether the transmissions were successful. On most days, the fax log reflects the transmission of only about a dozen faxes. However, on a few days in 2015, KRS transmitted tens of thousands of faxes. KRS was able to transmit such a large number of faxes, a practice referred to as "fax blasting,"[2] by using one or more employee's computer(s) to send an image to a database of fax numbers through RingCentral.

Based upon the fax log, the largest number of outgoing fax transmissions occurred on October 8 and October 9, 2015 when KRS allegedly transmitted a total of 34,773 outbound faxes, 99.4% of which originated from the same number as the

---

[1] Plaintiff also names John Does 1-10.

[2] Despite the vilification of the terms, neither "robo-calling" nor "fax blasting" violate the TCPA *per se*, so long as the caller or party transmitting the fax has obtained "consent" in the manner authorized by the statute and accompanying FCC regulations.

number used to send Plaintiff the Infusion Kit Fax. KRS disputes that it faxed 34,773 copies of the Infusion Kit Fax, but admits it transmitted between 1,000 and 10,000 of that advertisement. It maintains that the remainder of the 34,773 faxes were business communications. The fax log reflects only that a fax was transmitted, not the content of the fax.

Plaintiff's complaint also alleges that the Infusion Kit Fax did not display a "proper opt-out notice." (Doc. 1 at ¶17). Refining the definition of the putative class in its motion for class certification, Plaintiff seeks to represent 34,773 recipients of faxes transmitted by KRS, defined as:

> All subscribers of accounts (or other persons/entities) associated with the (1) fax numbers listed in the RingCentral spreadsheet (2) that were successfully sent a fax from KRS Biotechnology (3) from the phone number (888) 502-2050; (4) with a "start time" of October 8 or October 9, 2015.

(Doc. 23 at 11-12; *compare* to Doc. 1 at ¶17 (broader definition of proposed class in complaint)). In addition to Plaintiff's claims under the TCPA, Plaintiff seeks relief under the Ohio Deceptive Trade Practices Act, Ohio R.C. § 4165.01-.04, based upon a portion of the content of the Infusion Kit Fax.

## II.    Analysis

### A.  Standard of Review for Class Certification

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Sandusky Wellness Center, Inc. v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 466 (6th Cir. 2017), *cert. denied,* 138 S.Ct. 1284 (2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011)(internal quotation marks omitted). The plaintiff who seeks class certification

must "affirmatively demonstrate" compliance with the provisions of Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350. The plaintiff must "satisfy through evidentiary proof" both the four factors listed in Rule 23(a) (numerosity, commonality, typicality, and adequate representation), and at least one of the provisions of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 133 S.Ct. 1426, 1432 (2013).

In determining whether to certify a class, the trial court is required to conduct a "rigorous analysis" and "to probe behind the pleadings." *Dukes*, 564 U.S. at 350–51. At the same time, so long as it is exercised within the framework of Rule 23, a trial court retains "broad discretion" in deciding whether to certify a class. *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996)(additional citations omitted). In the case presented, Plaintiff argues that this Court should certify a class of 34,773 members based upon his proof of the four factors set forth in Rule 23(a), plus two factors under Rule 23(b)(3), which requires a plaintiff to show the "superiority" of litigating through the mechanism of a class action, and the "predominance" of common issues among the class members. (*See* Doc. 25 at 2, acknowledging that Plaintiff must show a total of "six prerequisites").

Out of the six prerequisites, the most salient, and the one on which both parties focus, is predominance. Under Rule 23(b)(3), Plaintiff must affirmatively show and the trial court must find "that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Id.* Defendant urges this Court to deny class certification primarily based on the Sixth Circuit's analysis of the predominance issue in *Sandusky Wellness*. Despite initially failing to cite that decision, Plaintiff proclaims in its reply memorandum that "*Sandusky Wellness*

demonstrates – perhaps better than any other single decision – the propriety of class certification in this case." (Doc. 25 at 2). Because the undersigned agrees that the resolution of the predominance issue under *Sandusky Wellness* is controlling, the undersigned will focus on that issue prior to review of any other prerequisite.

### B. A Brief Overview of the TCPA and the Junk Fax Provision

Private litigation under the TCPA has increased significantly in the federal courts in recent years.[3] In 2010, the Sixth Circuit joined the Seventh Circuit and held that federal-question jurisdiction exists over private TCPA actions. *See Charvat v. EchoStar Satellite, LLC*, 630 F.3d 459, 463-465 (6th Cir. 2010). Although other Circuits had initially held that state courts had exclusive jurisdiction over private actions, the Supreme Court resolved the Circuit split in favor of federal-question jurisdiction in *Mims v. Arrow Financial Serv.*, LLC, 132 S. Ct. 740, 747 (2012)(discussing Circuit split and holding that federal and state courts have concurrent jurisdiction over private suits arising under the TCPA).

The provision under which Plaintiff proceeds in this case, the Junk Fax Prevention Act of 2005,[4] was added to the TCPA in order to prohibit the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement," unless certain conditions are met. 47 U.S.C. § 227(b)(1)(C). A fax is "unsolicited" if it is sent to persons who have not given

---

[3]This Court has seen a number of repeat plaintiffs represented by counsel, as well as repeat pro se litigants. *See e.g., Johansen v. One Planet Ops, Inc.*, 2018 WL 1558263 (S.D. Ohio March 5, 2018)(noting plaintiff had filed 21 TCPA lawsuits in the past three years); *Lucas v. DeSilva Automotive Servs.*, Case No. 1:16-cv-790, Doc. 122 at n. 1 (S.D. Ohio Oct. 19, 2017) (noting pro se plaintiff had filed at least 8 TCPA lawsuits containing similar allegations in federal court, with additional suits filed in state courts),
[4]The amendment sometimes is referred to by its acronym, the JFPA. The undersigned will instead refer to it as the junk fax provision of the TCPA, finding one acronym for the statute to be sufficient.

their "prior express invitation or permission, in writing or otherwise" to receive it. *Id.,* §227(a)(5). While the future of the fax remains a subject of academic debate, case law suggests that the old-school fax is not yet on its last breath, particularly in the health care field. *See Bais Yaakov of Spring Valley v. Federal Communications Com'n*, 852 F.3d 1078, 1079 (D.C. Cir. 2017)("Believe it or not, the fax machine is not yet extinct.").

A year after the Supreme Court confirmed the existence of federal-question jurisdiction over private TCPA suits, the Seventh Circuit blithely declared in a junk fax case that "[c]lass certification is normal in litigation under § 227, because the main questions, such as whether a given fax is an advertisement, are common to all recipients." *Ira Holtzman, C.P.A. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013). In *Sandusky Wellness*, however, the Sixth Circuit cautioned that "[w]hile class certification may be 'normal' under the TCPA…, that does not mean it is automatic." *Sandusky Wellness*, 863 F.3d at 473 (quoting appellant's citation to *Turza*). Indeed, evolving case law under the TCPA in general, and the junk fax provision in particular, suggests that the Seventh Circuit's proclamation of class certification as "normal" was premature, and that future junk fax cases face steeper hurdles in proving that they should be prosecuted as class actions rather than the "usual" course in which a claim is prosecuted solely on behalf of the individual named party.[5] *Dukes*, 564 U.S. at 348.

---

[5]In *Mims*, the Supreme Court dismissed the concern that finding federal-question jurisdiction over private actions under the TCPA would open the floodgates on the basis that the argument assumed "a shocking degree of noncompliance" with the TCPA. Writing for a unanimous Court, Justice Ginsburg pointed out that federal civil filing fees ($400 as of this date) serve as a practical bar against filing or removing such suits to federal court, given that the TCPA generally limits damages to just $500 per claim. Further dismissing the view that federal courts would not soon be flooded with cases that traditionally had been filed in small claims courts, *Mims* pointed out that nearly all of the small number of TCPA cases that had been removed from the state courts at that time, or brought initially in federal courts, had been class actions. *Mims*, 565 U.S. at 386. Because the Court did not cite to specific cases, the nature of those actions remains unclear. *Mims* itself did not involve the junk fax provision of the TCPA, but instead an allegation that the respondent had sought to collect a debt by repeatedly using an automatic telephone

### C. A Seminal Rule 23(b)(3) Case Focusing on Consent

#### 1. The Facts and Focus of *Sandusky Wellness*

The plaintiff in *Sandusky Wellness* was a chiropractic clinic. Similar to the allegations presented by Plaintiff herein,[6] Sandusky alleged that the Defendant, a pharmaceutical distributer, violated the TCPA by sending an unsolicited one-page fax advertisement that lacked a proper "opt-out" notice. Sandusky sought to certify a putative class of more than forty thousand fax recipients of the same fax. The district court denied Sandusky's motion for class certification, and the Sixth Circuit affirmed. The Sixth Circuit began its analysis with a brief historical overview of the junk fax provision of the TCPA. Because the predominance issue is driven by that history, the undersigned begins with a similar review.

Congress granted to the Federal Communications Commission (FCC) the authority to promulgate rules implementing the TCPA. In 2006, the FCC promulgated the "Solicited Fax Rule," that required both unsolicited and <u>solicited</u> faxes "to include opt-out notices." *Sandusky Wellness*, 863 F.3d at 463 (emphasis added). As *Sandusky Wellness* noted, "[t]he import of the TCPA's damage scheme [allowing up to $1,500 per fax for willful violations] combined with the FCC's Solicited Fax Rule meant vast exposure to liability for businesses that used fax machines to advertise." *Id.* After *Mims* confirmed the existence of federal-question jurisdiction over private TCPA claims, federal courts saw an increase in class-action complaints based in part on the Rule, since cases seeking millions of dollars could be filed if the recipient could prove that the

---

dialing system or prerecorded or artificial voice to call Mims's cellular phone without his consent.
[6]Plaintiff's counsel in this case also represented the plaintiff in *Sandusky Wellness*.

opt-out notice was not sufficiently "clear and conspicuous," regardless of whether any recipient had solicited or consented to the fax.

"Concerned by this specter of crushing liability, businesses (and courts) began to question whether the FCC possessed the authority to promulgate the Solicited Fax Rule given that the text of the TCPA appeared to reach only unsolicited faxes." *Id.* at 464. To the dismay of those businesses, the FCC doubled down, standing by its Solicited Fax Rule in 2014. *See id.* (citing Order, *Petitions for Declaratory Ruling, Waiver, and/or Rulemaking Regarding the Commission's Opt-Out Requirements for Faxes Sent with the Recipient's Prior Express Permission*, 29 F.C.C.R. 13,998, 14,005 (2014)("2014 Order")). Nevertheless, the 2014 Order granted retroactive waivers of liability to the petitioners, and the FCC encouraged others to seek similar waivers.

The defendant in *Sandusky Wellness*, doing business as Besse Medical AmerisourceBergen Specialty Group ("Besse"), regularly advertised through fax blasting. Following the 2014 Order, Besse sought and obtained a retroactive FCC waiver for "solicited" faxes. Prior to obtaining that waiver, however, Besse had purchased a list of physician fax contact information from a notorious third-party data provider.[7] Besse later learned that the purchased list included some current or former customers with whom it had established business relationships, as well as those like Sandusky with whom Besse had no prior relationship.

---

[7] The third party data provider, InfoUSA, has become infamous for its role in providing contact lists to another entity, Business to Business Solutions ("B2B"), which has been called a "Typhoid Mary" by the Sixth Circuit for its illegal junk fax practices. *See, e.g., Bridging Cmtys.*, 843 F.3d 1121-1123; *Siding and Insulation Co. v. Alco Vending, Inc.*, 2017 WL 3686552 at *1 (N.D. Ohio Aug. 25, 2017)(noting that as of 2016, the activities of B2B had sparked more than 100 lawsuits); *Machesney v. Lar-Bev of Howell, Inc.*, 2017 WL 2437207 at *4 (E.D. Mich. June 6, 2017)(describing "incredibly similar" B2B cases, at least 71 of which had been filed in federal court by the same plaintiff's counsel).

Sandusky sued Besse on the basis of its receipt of a 2010 unsolicited fax advertisement that included an allegedly inadequate opt-out notice. The trial court denied Sandusky's motion for class certification after concluding that the proposed class failed to satisfy Rule 23(b)(3), because both class member identity and consent would require too much individualized inquiry. With respect to consent, the trial court held that the FCC's retroactive waiver would require individual inquiries on whether each class member had consented to receipt of the fax. *Sandusky Wellness Center, LLC v. ASD Specialty Healthcare, Inc.*, 2016 WL 75535 at *4 (N.D. Ohio Jan. 7, 2016); *see also Sandusky Wellness*, 863 F.3d at 465 (summarizing trial court's holding).

In the meantime, after the FCC issued its 2014 Order, several businesses sought judicial review of that 2014 Order in multiple circuit courts. The Multidistrict Litigation Panel assigned petitions challenging the Solicited Fax Rule to the D.C. Circuit, which became "the sole forum for addressing…the validity of the FCC's rule[]." *Id.*, 863 F.3d at 467 (quotation marks and citation omitted). In March 2017 (after the trial court in *Sandusky Wellness* issued its decision), "a split panel of the D.C. Circuit struck down the Solicited Fax Rule, holding it 'unlawful to the extent that it requires opt-out notices on solicited faxes.'" *Sandusky Wellness*, 863 F.3d at 464 (quoting *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017)).

With the benefit of the D.C. Circuit's decision, the Sixth Circuit in *Sandusky Wellness* held that "the district court was correct to conclude that individualized questions of consent prevent common questions from predominating under Rule 23(b)(3)." *Id.* at 466. However, rather than relying on the FCC's retroactive waiver as the trial court had, the appellate court affirmed on the alternative grounds of the ruling

set forth in *Bais Yaakov*. Thus, the Sixth Circuit found that the invalidation of the Solicited Fax Rule "altogether confirms that Besse cannot be liable to any individuals who solicited" the fax, and that "questions of consent present individualized issues counseling against class certification." *Id.* at 467 (holding that the decision striking down the Solicited Fax Rule binds the Sixth Circuit).

The elimination of the Solicited Fax Rule and *Sandusky Wellness* represent a sea change in the availability of class certification for junk fax cases filed under the TCPA. When the Solicited Fax Rule was still in effect, putative classes could more easily satisfy the "predominance" requirement, as there was no need for individualized inquiry on the issue of consent so long as a plaintiff challenged the sufficiency of the defendant's "opt-out" language, even if the fax was sent to those with an established business relationship.[8] In *Sandusky Wellness*, however, the Sixth Circuit clarified that where a defendant has demonstrated more than a "speculative" dispute about whether some portion of those who received the fax consented to receipt, class certification should be denied.

The *Sandusky Wellness* court began with the following general guidance on how to determine whether class-wide issues or issues requiring more individualized inquiries are predominant under Rule 23(b)(3).

---

[8]In its reply memorandum (though not at oral argument), Plaintiff argues that issues concerning the adequacy of the "opt-out" notice on the Infusion Kit Fax remain sufficient to certify the class on the record presented, because faxes sent to recipients with an "established business relationship" (existing or former customers, including some who solicited the information) must still contain an adequate opt-out notice. However, *Sandusky Wellness* forecloses that argument, because individualized inquiries concerning consent would still be required. *Accord Whiteamire Clinic, P.A. Inc. v. Cartridge World North America, LLC*, 2018 WL 571917, at *4 (N.D.Ohio, 2018)(noting that under *Sandusky Wellness*, "solicited or consented to faxes are NOT required to contain the requisite opt-out provisions."); *see also Bais Yaakov*, 852 F.3d at 1084 (Pillard, J., dissenting with majority's assertion that the "requirement of an opt-out notice on unsolicited faxes sent pursuant to an established business relationship 'is central to this case.'").

In discerning whether a putative class meets the predominance inquiry, courts are to assess "the legal or factual questions that qualify each class member's case as a genuine controversy," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623m 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), and assess whether those questions are "subject to generalized proof, and thus applicable to the class as a whole," *Bridging Cmtys., Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016) (internal citation omitted). "If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." [citation omitted]. Plaintiffs need not prove that every element can be established by classwide proof. *Bridging Cmtys.*, 843 F.3d at 1124. But the key is to "identify[ ] the substantive issues that will control the outcome," in other words, courts should "consider how a trial on the merits would be conducted if a class were certified." *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008) (quotation marks omitted).

*Sandusky Wellness*, 863 F.3d at 468

In *Sandusky Wellness*, Besse had produced evidence that "several thousand" individuals on the purchased list of "intended fax recipients" were "current or former Besse customers." *Id.* 863 F.3d at 468. Besse's evidence included more than 450,000 pages of various forms where customers had provided fax number information. The district court found that limiting the class to those who had not consented to receipt of faxes "would require manually cross-checking 450,000 potential consent forms against the 53,502 potential class members." *Id.*, at 469 (quoting district court opinion). Relying heavily on a Fifth Circuit decision in which consent issues also predominated and class certification was denied, *see Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008), the Sixth Circuit in *Sandusky Wellness* agreed:

Here, if Sandusky's 40,343-member class were certified, the district court would be tasked with filtering out those members to whom Besse was not liable – those individuals who solicited the Prolia fax. Regardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation. *See id.* In other words, "one substantive issue undoubtedly will determine how a trial on the merits will be conducted if the proposed class is certified." *Id.* at 327. "This issue…is whether [Besse's] fax advertisements were

transmitted without the prior express invitation or permission of each recipient. Thus the predominant issue of fact is undoubtedly one of *individual* consent." *Id.*

*Id.*, 863 F.3d at 468 (emphasis original).

### 2. Applying *Sandusky Wellness*: Whether Individualized Issues Predominate In This Case

As stated, Plaintiff Sawyer seeks to define a class of 34,773 fax recipients as listed on the RingCentral fax log. However, Defendant maintains that only the single fax received by Sawyer was "unsolicited." The undersigned agrees that the fax log evidence is insufficient to carry Plaintiff's affirmative burden to show predominance because: (a) Defendant has offered testimony that its practice was to send faxes only to those who "solicited" or gave permission/consent to the receipt of faxes, and neither the fax log nor any other evidence rebuts that evidence; and (b) the fax log does not reflect precisely <u>what</u> was faxed to each of the 34,773 numbers.

### a. Specific Evidence Offered By Defendant

The Vice President of Sales, Tanner Suer, testified that he has been employed by Defendant since 2013 and oversees a sales staff of 18 people, including 14 employees who work full-time in an in-house call center, making contacts with existing and prospective customers. Suer created the content for the Infusion Kit Fax, as well as similar marketing materials, but was generally unfamiliar with the TCPA or its junk fax provision prior to learning of this lawsuit.[9]

When asked how KRS obtains the numbers for potential customers to whom it faxes such materials, Suer responded: "They're either given to us or public records," the

---

[9]While ignorance of the law is no defense, neither is it inculpatory in this case. Defense counsel argued that Defendant was driven to obtain consent to fax as a simple matter of good business practice, to avoid annoying potential customers that sales team members were trying to convert into actual customers.

latter of which are pulled by KRS employees from public websites. (Doc. 22, Suer Deposition, at 29). Unlike the fact pattern most commonly presented in junk fax cases, KRS has never purchased any lists of fax numbers since Suer began working for the company in 2013.[10] *See, e.g., Bridging Cmtys., Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1122-1126 (6th Cir. 2016) (Defendant employed B2B to send faxes using list purchased from InfoUSA, Inc.); *Siding & Insulation Co. v. Beachwood Hair Clinic, Inc.*, 279 F.R.D. 442, 443-44, 446 (N.D. Ohio 2012)(finding "no questions of individualized consent" where defendant purchased list of 16,000 fax numbers from InfoUSA and hired another third-party, B2B, and "presented no evidence that it had established business relationships with any" of the recipients); *Siding & Insulation Co. v. Combined Ins. Grp.*, 2012 WL 1425093 at *1 (N.D. Ohio Apr. 24, 2012)(defendant hired fax broadcaster, B2B, which used a third-party database acquired from InfoUSA); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 643, 647 (D. Wash. 2007)(Defendant obtained all of recipients' fax numbers from the same third-party; main issue was whether inclusion in third party's database constituted "express permission" to receive faxes, which did not require individualized inquiry); *see also Johansen v. One Planet Ops, Inc.*, 20189 WL 1558263 at *5 (S.D. Ohio March 5, 2018)(in telemarketing call case, holding that issues of consent involving purchased list did not preclude class certification where defendant had produced no evidence of prior express consent from anyone, and where record indicated that consent was determinable on a class-wide basis since "consent was given, if at all, through an online form"); *Silbaugh v. Viking Magazine Servs.*, 278 F.R.D.

---

[10]All cases relied upon by Plaintiff involve purchased fax lists. To be clear, however, developing the fax list internally would not insulate a defendant who indiscriminately develops a list, without seeking consent prior to sending a fax or including appropriate opt-out language. Still, the uncontested evidence here is that Defendant and its sales force, as a "rule," faxed only to contacts who gave consent or permission.

389 (N.D. Ohio 2012)(class certified in text messaging case where defendant admitted that he did not obtain consent or take steps to confirm that consent was made by third party that he employed to robo-call/text).

Defendant's agents testified unequivocally that the practice and/or "protocol" was for its sales force to obtain express consent or permission to fax prior to sending any fax, notwithstanding the absence of a formal "policy" prior to this lawsuit.[11]  When asked if he had ever personally had a telephone conversation with a prospective customer in which he stated: "[W]e'd like to send you a marketing flyer to your fax machine.  Will you agree to do so?" Suer responded: "No. Me personally, I have not, but my 20 sales reps do have that conversation quite often."  (Suer Depo at 40).  The Chief Operating Officer and Chief Technology Officer, Bruce Fromhoff, testified similarly, and unequivocally, that KRS would "ask people if they could send ads to their fax machines," although no formal records were kept specifically concerning the issue of consent. (Doc. 21, Fromhoff Depo at 26).  *Accord Gene & Gene*, 541 F.3d at 323-328 (Defendant's failure to keep records about consent was insufficient basis to grant class certification, because plaintiff failed to show predominance and defendant raised a bona fide issue of consent).  Fromhoff testified about how fax numbers are acquired and placed on contact list as a "general rule" or course of business:

> A.   General rule is we go to a number of trade shows.   We call offices and doctors and hospitals and whatnot, surgical centers, asking them if they would be interested in our product. And they -- the end user, the business would request information, either via e-mail or via fax.   Again, trade shows, business cards, meeting events, or we show up in person.
>
> Q. Okay. So KRS, in one form or another, has slowly built a collection of fax numbers of potential customers?

---

[11]Fromhoff insituted a formal policy the day after receiving notice of suit.  (Fromhoff Depo at 30).

A. Correct.

Q. And that must have included the fax number that [Infusion Kit Fax] …was sent to?

***

A. Yes, yes. It's -- it's -- we've been in business for, I guess, a number of years, and we have multiple people that are seeking new business. So through various, again, events or trade shows, or going into a business office or cold-calling or searching the Internet, which we do a lot of, as well, that's where we seek our business.

Q. Okay.

A. Oh, excuse me. And a large number of referrals.

Q. Okay. Thank you. And can you tell me -- but KRS has no way of determining how it acquired a particular fax number?

A. No.

(Fromhoff Depo at 16-17). Thus, KRS provided unrebutted evidence that its call center employees had an established business practice of obtaining consent, despite the lack of documentation to verify their calls or consent to fax.[12]

Both Suer and Fromhoff testified that the only central database of contacts maintained by KRS was through software called "SAP," a type of interactive accounting software that contains information, including some (but not all) fax numbers of former or current customers. (Fromhoff Depo at 18-19). Suer testified that additional "contact files" (not necessarily in the SAP database unless a purchase has been made) are generated by the individual sales team members. The individual sales team member lists include: (1) customers who have "purchased" from KRS; (2) a "[p]otential client

---

[12]Aside from Suer's testimony, the testimony of Fromhoff as a Rule 30(b)(6) deponent was sufficiently probative evidence on Defendant's established business practices. Plaintiff did not depose any of the individual sales team members, leaving unrebutted Defendant's presumptive evidence of consent. Regardless of whether that evidence would carry the day as to each individual fax recipient, it is sufficient to show the predominance of individualized issues of consent on class certification.

[who] would be a prospect that's asking buying questions; and (3) a "prospect [who] could be someone you just talked to on the phone without asking buying questions or they're just somebody you feel is someone that would benefit from our services…." (Suer Depo at 53; Fromhoff Depo at 19-21 (explaining that lists of prospects and potential customers are individually maintained by sales representatives, with only contacts of purchasing customers maintained in the SAP list)).

With respect to sales employees, Fromhoff testified that the company sales "protocol" was as follows:

> [W]hen you are going to reach out to someone, either via e-mail or phone, and we request, you know, they request information, or we would like to send them information, and they would say, you know, "Okay. You can send me some information." And a lot of doctors' offices, for whatever reason, they say, "Send it via fax. Don't e-mail it to us. We don't want the e-mail. Send it to a fax, and I'll just put it in front of the doctor."

(Fromhoff Depo at 27). Fromhoff was emphatic that KRS employees do not send faxes unless the contact gives permission to do so, and the Defendant is provided with a fax number. (*Id.* at 28-29, 45-46). In August 2015, KRS began maintaining a list of people who indicate "that they do not want to receive faxes from us anymore," (Suer Depo at 42-43), which is used to remove those numbers from the various contact lists.

In 2015, IV infusion was "trending," meaning that there was higher interest in that product. When a product is trending, KRS call center employees will "reach[] out to as many physicians that we can possibly contact on a daily basis, pitch them our product, product line, actually, for IV infusion and then we would send them over this marketing flyer…." A sales employee's performance is based upon the number of outbound calls that he/she makes, but the number of faxes that are transmitted is not monitored. (Suer Depo at 60-61). Fromhoff testified that KRS does not send marketing faxes to anyone,

as a rule, unless that customer or potential customer has requested the material. (Fromhoff Depo at 23). In other words, KRS does not have a practice of fax blasting to its entire customer list. (*Id.* at 23).

Although Defendant has multiple fax machines, sales team members typically use a primary fax number to send virtually all faxes. Plaintiff does not dispute that Defendant sends many faxes in any given month or year that fall within the category of business communications rather than the type of advertisements that are prohibited by junk fax provision of the TCPA. With respect to the Infusion Kit Fax ad, Defendant has admitted that it sent between one and ten thousand, but argues that none (except the single ad sent to Sawyer) were "unsolicited." Defendant maintains that the majority of the 34,773 faxes that Plaintiff seeks to include in the proposed class represent other "business communications" and were not ads at all.[13]

The fax logs confirm the primary fax number used by the Defendant, and that 34,773 faxes were sent on October 8 and 9, 2015. However, the fax logs do not reveal the content of the faxes that were transmitted, whether the Infusion Kit Fax that Plaintiff received, some other type of marketing flyer (Defendant produced approximately 10), or some form of business communication.

### b. The Parties' Arguments on Predominance

Both in his memoranda and at oral argument, Plaintiff repeatedly attempts to shift the burden to the *Defendant* to prove that individual issues relating to consent will predominate. Plaintiff insists that the burden is on KRS to prove consent as a defense

---

[13]Given the lack of any apparent record of <u>what</u> Defendant faxed nearly three years ago on October 8 and 9, 2015, it is unclear how Plaintiff would prove that the 34,773 faxes represented the same ad, or how Defendant would prove the contrary (depending on which party carried the burden of proof at that stage).

to his claim.[14]   The evidence behind the underlying claims undeniably informs the class certification analysis, but in this Rule 23 context, it remains Plaintiff's obligation to affirmatively demonstrate predominance.   Thus, it is Plaintiff's burden to <u>first</u> show that class-wide issues predominate.   The evidence presented by KRS on consent is considered in that context.  Plaintiff's junk fax claim requires proof that the faxed ad was unsolicited – an element that KRS has disputed as to every member of the proposed class but for Sawyer.   After KRS presented sufficient, non-speculative evidence that a bona fide issue of consent exists as to all other faxes, Plaintiff was required to come up with something (whether argument or evidence) to persuade this Court that those individualized consent issues would not drive this litigation, making a class action untenable.

Rather than focusing on the core issue, Plaintiff first argued that the "predominant" issue is whether the Infusion Kit Fax is an "advertisement" within the meaning of the junk fax provision of the TCPA.  It is not.  Defendant has not disputed that the Infusion Kit Fax is an ad.  What it does dispute is the issue of consent to send that ad, as well as the number of Infusion Kit Faxes that were transmitted.

For the reasons expressed in *Sandusky Wellness* and by other courts on similar records, the evidence presented by Defendant demonstrates that issues concerning individual consent would predominate over any other issues in this case.   *Accord*

---

[14]At oral argument, KRS disputed this contention, arguing that recent case law confirms that the burden to show that a fax is "unsolicited" (i.e., without permission or consent) remains on the plaintiff as an essential element of the claim.  *See e.g., Gorss Motels v. Safemark Sys., LP*, 2018 WL 1635645 (M.D. Fla. April 5, 2018); *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537 (D. MN. 2017)(TCPA claimant must show calls placed without consent).  I find it unnecessary to fully resolve this debate in the more limited context of the pending class certification motion. *See Gene And Gene LLC v. BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008) ("Whether established by BioPay as an affirmative defense or by Gene as an element of the cause of action, the issue of consent will entirely determine how the proposed class-action trial will be conducted on the merits.").

*Sandusky Wellness*, 863 F.3d at 468 "Regardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation." (citing *Gene & Gene, LLC v. BioPay, LLC*, 541 F.3d 318, 326 (5th Cir. 2008)(declining to certify class in junk fax case where plaintiff could not establish predominance based on need for individualized inquiries regarding consent)); *See also Siding and Insulation Co. v. Alco Vending, Inc.*, 2017 WL 3686552 at *8 (N.D. Ohio Aug. 25, 2017)(same); *Brodsky v. Humandental Insur. Co.*, 269 F.Supp.3d 841 (N.D. Ill. 2017)(decertifying class due to predominant issues of individualized consent in junk fax case after elimination of Solicited Fax Rule); *Froman v. Data Transfer, Inc.*, 164 F.R.D. 400, 402 (E.D. Pa. 1995)(denying class certification in junk fax case where consent was at issue); *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp.1162, 1169-70 (S.D. Ind. 1997)("denying class certification because consent would have to be proven via individual inquiries as to each class member"); *Levitt v. Fax.com*, 2007 WL 3169078 at **4-7 (D. Md. May 25, 2007)(decertifying class for same reasons).

Plaintiff protests, arguing that this case more closely represents *Bridging Cmtys., Inc. v. Top Flite Fin., Inc.*, 843 F.3d 1119, a case involving notorious third-party fax-blasters and decided the year before *Sandusky Wellness*. In *Bridging Cmtys.*, however, the defendant merely "raised the possibility" that "individual class members might have solicited or consented to receiving the challenged faxes." *Sandusky Wellness*, 863 F.3d at 469 (quoting *Bridging Cmtys.*, 843 F.3d at 1123, 1125). The *Bridging Communities* court noted that there was evidence that B2B had failed to verify consent from anyone on the list it purchased from InfoUSA, suggesting a basis for class-wide proof on the lack of consent. Under those circumstances, the defendant's failure to offer anything

more than "speculation and surmise" that some recipients on a purchased fax-blaster list "might" have consented was not sufficient to defeat certification. *Bridging Cmtys.*, 843 F.3d at 1124-1125.  The Sixth Circuit found the "mere mention" of the possibility of consent, without evidentiary support, to be insufficient to defeat the Plaintiff's affirmative showing of predominance regarding the lack of consent. *Id.* at 1126.[15]

In contrast to *Bridging Communities*, Plaintiff has offered no class-wide evidence suggesting a lack of consent.  Further, like in *Sandusky Wellness*, Defendant KRS has produced "concrete evidence of consent" that the majority of the faxes sent on October 8-9, 2015 were not "unsolicited," but instead were sent to: (1) established or potential customers who "solicited" the advertisements; (2) who requested that KRS fax other business-related or prescription-related faxes (not advertisements); or (3) fax numbers where the sales member first contacted the person or entity to request consent prior to sending the fax.  In short, KRS has provided evidence that the fax received by Sawyer in this case was an aberration or exception to the Defendant's established business practice.  Although Plaintiff repeatedly insists that Defendant has "produced no evidence of consent whatsoever," (*see, e.g.*, Doc. 25 at 2), that is not a correct statement.  Defendant has offered testimony, as well as an affidavit that its Technology Officer contacted "five numbers" from the RingCentral fax log for the October 8 date,

---

[15]In *Sandusky Wellness,* the Sixth Circuit held that post-hoc evidence of consent by *some* will defeat class certification, even where the fax was to a purchased list from an entity that did not verify consent prior to fax-blasting, as in *Bridging Cmtys.*  Aside from the significant intervening elimination of the Solicited Fax Rule, the critical distinction between the two cases is that in *Bridging Cmtys.*, the defendant presented only argument without evidence ("speculation and surmise"), while in *Sandusky Wellness*, the defendant came up with evidence that the purchased list had some overlap with existing customers who had given consent.

and that "each of these recipients had consented to receive fax transmissions, including advertising materials, from KRS." (*See* Affidavit attached to surreply, Doc. 26-1).[16]

Plaintiff's chief argument appears to be that Defendant has not offered the same *type* of evidence as in *Sandusky Wellness*, because there, the defendant offered documentary evidence (i.e., various types of customer forms) that contained fax numbers. Here, Defendant has produced no similar documentary evidence, but instead relies primarily upon the testimony of its employees. However, the undersigned finds no basis for distinguishing between the probative value of the <u>documentary</u> evidence presented in *Sandusky Wellness* and the <u>testimonial</u> evidence offered here, at least at the class certification level where Plaintiff must affirmatively show predominance under Rule 23(b)(3).

The junk fax provision prohibits only "unsolicited advertisements," defining such materials as advertising "which is transmitted to any person without that person's prior express invitation or permission, in writing *or otherwise.*" 47 U.S.C. § 227(a0(5)(emphasis added). The FCC's Rules and Regulations "emphasize that [the FCC] is not requiring any specific records [to] be kept by facsimile senders," and that permission to send fax advertisements may be "granted in writing or orally." Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991; Junk Fax Prevention Act of 2005, 71 Fed. Reg. 25967, 25971. It is true that the Commission also expressed "concern" that oral permission "may result in some senders erroneously

---

[16]Plaintiff complains that the affidavit is too little, too late, and that it constitutes hearsay. The first criticism is not persuasive since it is Plaintiff's affirmative burden to show that class certification is appropriate. Defendant had no burden to produce new affidavit evidence to support deposition testimony that it routinely obtained oral consent in its ordinary course of business. And, although the criticism that the affidavit contains hearsay is valid, the undersigned assumes that the fax recipients whose hearsay was included in the affidavit would be available to testify similarly if called at trial. Finally, the undersigned would find that Plaintiff has failed to show predominance even if the affidavit were not considered.

claiming they had the recipient's permission," and that the Commission warned that the sender "should have the obligation to demonstrate that it complied with the rules." *Id.*, 71 Fed. R. 25967-01, 2006 WL 1151584 (May 3, 2006). At the same time, the FCC made clear that evidence of established business practices – the precise type of evidence offered by Defendant here - could suffice.

> Senders who choose to obtain permission orally are expected to take reasonable steps to ensure that such permission can be verified. In the event a complaint is filed, the burden of proof rests on the sender to demonstrate that permission was given. The Commission strongly suggests that senders take steps to promptly document that they received such permission. (An example of such documentation could be the recording of the oral authorization. Other methods might include established business practices or contact forms used by the sender's personnel.) Express permission need only be secured once from the consumer in order to send facsimile advertisements to that recipient until the consumer revokes such permission by sending an opt-out request to the sender.

*Id.*, 71 Fed. R. at 25972 (emphasis added).

In addition to being permitted by FCC Rules, KRS's evidence bears more than a passing resemblance to that presented by the defendant in *Gene & Gene v. BioPay, LLC*, the Fifth Circuit case that is heavily cited by *Sandusky Wellness*. There too, the defendant's employees kept no records and could not distinguish which recipients gave express consent and which did not, but the record reflected they had collected fax numbers over time from a variety of sources in addition to purchasing numbers through third parties, B2B and InfoUSA.[17] The Fifth Circuit still found that the plaintiff failed to

---

[17]The Fifth Circuit suggested that where a defendant purchases a list and obtains "all of the fax recipients' fax numbers from a single purveyor" without checking consent, there exists a "class-wide means of establishing the lack of consent based on arguably applicable federal regulations." *Id.* 541 F.3d at 327-328. In *Sandusky Wellness,* the Sixth Circuit arguably retreated from that dictum to the extent that it held that post-hoc evidence of consent by *some* recipients on a third-party purchased list will defeat class certification, even if the defendant faxed first, and sought to verify permission or consent only after suit was filed.

meet the predominance burden, because "there is no class-wide proof available to decide consent and only mini-trials can determine this issue." 541 F.3d at 328-329.

In some respects, Defendant's testimonial evidence is stronger than the evidence presented in *Sandusky Wellness.* While the vast majority of junk fax cases (including *Sandusky Wellness*) involve businesses that fax-blast indiscriminately to purchased lists from third parties,[18] KRS has never engaged in that particularly fraught practice. Nor has KRS ever hired a third party to transmit faxes on its behalf. Instead, the unrebutted testimony is that faxes were sent to lists of numbers developed exclusively by the Defendants' 18-20 member sales force over a period of years, through a custom and practice that would favor a finding of consent-to-fax by the overwhelming majority of the listed fax recipients. As in *Sandusky Wellness*, the testimonial evidence offered by the Defendant sets it apart from *Bridging Communities*, in which the defendant offered nothing more than "speculation and surmise" that some hypothetical recipient may have consented. *Bridging Cmtys.*, 843 F.3d at 1125. There is simply no way for Plaintiff to get around the thorny issue of proving, on a class-wide basis, whether others who received the Infusion Set Fax had consented to receipt of such materials through "express invitation or permission, in writing or otherwise." As in *Sandusky Wellness*, distinguishing between those class members to whom "unsolicited" faxes were sent and those who should be deemed to have provided consent would be "no hypothetical scenario," but would instead predominate this case, requiring "myriad mini-trials" and a

---

[18]The defendant in *Sandusky Wellness* initially sent faxes to a list purchased from a third-party data provider, and produced post-hoc evidence of consent only after suit was filed. Sandusky had argued that the practice of fax-blasting indiscriminately to a purchased list should foreclose argument on consent. The Sixth Circuit disagreed. "Perhaps Besse risked a lack of consent by relying on this data collector initially, but its ability to produce later consent evidence saves Besse from this downfall." *Id.* at 469.

"painstaking sorting process" for each of the alleged members of the class. *Accord,*

*Sandusky Wellness*, 863 F.3d at 469-470.

Because the issues of consent predominate and preclude class certification, I

find no need to delve deeply into Rule 23(b)(3)'s "superiority" requirement, but will

briefly discuss Plaintiff's general warning that if this Court does not certify the class,

then KRS could subject every individual who files suit

> to the same burden [Plaintiff] has had to bear in this case: i.e., deny
> everything at the outset of the case; force each claimant to conduct
> discovery and take depositions to establish their prima facie claim;
> prepare and file/response to motions; and eventually go to trial just to get
> a meager award of $500.00. Certification of a class eliminates this
> wasteful repetition…

(Doc. 25 at 7).

At the outset of this litigation in its responses to Plaintiff's first Requests for

Admission, KRS admitted TCPA liability as to Plaintiff Sawyer, though it denied liability

as to all other recipients of faxes transmitted on October 8 and 9, 2015. Plaintiff's

argument is not persuasive because it requires several presumptions that this Court is

unwilling to accept on the record presented: (1) that KRS's evidence of consent

(testimonial or otherwise) is fabricated; (2) that KRS expended significant defense costs

against Plaintiff's claim not because it believed that it had a valid defense (that sending

an unsolicited fax was contrary to its established business practices), but only to

discourage litigation; (3) that many others have actually received unsolicited faxed

advertisements; and (4) that any who received unsolicited ads would choose to file suit

in federal court, rather than filing in small claims court or seeking some other redress.

Based on the failure of Plaintiff to show predominance, I also find no need to

reach KRS's alternative argument, that the fax logs show only that faxes were sent, not <u>what</u> was sent.[19]

### D. Plaintiff's Rule 23(a) Showing

Plaintiff maintains that Defendant has offered "no argument" to oppose the Rule 23(a) prerequisites of numerosity, typicality, commonality and adequacy. (Doc. 25 at 2). That is not entirely accurate. Although the bulk of Defendant's argument is devoted to the more exacting predominance requirement, Defendant does not concede the first four requirements of Rule 23(a). (*See* Doc. 24 at 17, n.16, explaining focus on Rule 23(b)(3)'s predominance inquiry, despite refusing to concede any of the other requirements).

### 1. Numerosity

Plaintiff's complaint alleges that the number of class members exceeds forty. Plaintiff points to KRS's admission, in response to a discovery request, that it sent the Infusion Kit Fax to more than one thousand persons. In addition, Plaintiff points to the fax log maintained by RingCentral, which shows that KRS sent some type of fax to 34,773 numbers over the two-day period of October 8-9, 2015.

Defendant argues that Plaintiff still has not satisfied the numerosity requirement, because it is not a violation of the TCPA to send faxes to those who have solicited or requested information by fax. Defendant maintains that the available evidence, including but not limited to the testimony of its own employees, "shows that KRS sent marketing materials by fax overwhelmingly to established customers and prospective customers who solicited or consented to receive materials by fax." (Doc. 24 at 8).

---

[19]In all cases cited by Plaintiff, as well as in additional cases reviewed by the undersigned, the defendants did not contest (as Defendant does here) that the exact same fax was sent to a set number of recipients.

Defendant argues the fax log number is irrelevant considering that Defendant acknowledged only a fraction of that number, and posits that all of the recipients (except Sawyer) gave permission or consent. As previously noted, the fax logs contain no information concerning the content of the transmissions. Despite the significant overlap with fact issues concerning consent, I find that Plaintiff would be able to satisfy numerosity, based on Defendant's admission that it sent the same fax to more than one thousand recipients. *See Siding and Insulation Co. v. Alco Vending, Inc.*, 2017 WL 3686552 at *8 (N.D. Ohio Aug. 25, 2017)("Generally, the numerosity requirement is fulfilled when the number of class members exceeds forty.")(quotation omitted).

### 2. Commonality

The "commonality" requirement is a relatively low bar, as "there need only be one question common to the class," so long as the resolution of that question of law or of fact "will advance the litigation." *Sprague v. Gen Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)(*en banc*)(citation omitted). "This test requires only some common questions; not a predominance of common questions as required under Rule 23(b)(3)." *Siding and Insulation Co. v. Alco Vending, Inc.*, 2017 WL 3686552 at *9 (finding commonality based on admitted transmission of the same fax). Still, on the record presented where there is no evidence that any other recipient of a fax on October 8 or 9: (a) did not give permission to fax and instead received an "unsolicited" fax; and (b) received the exact same Infusion Kit Fax ad, even the relatively low bar of "commonality" can be difficult to satisfy. It is not clear to the undersigned that the mere fact that each of the 34,773 recipients received some form of fax is enough, given Plaintiff's failure to demonstrate

even one other instance of a recipient in the proposed class who received the same "unsolicited" fax.

### 3. Typicality

For the same reasons, because Plaintiff has not made any showing to suggest that each class member received the same fax or that each class member received an "unsolicited" ad, it does not appear that Plaintiff has demonstrated typicality.[20] *Contrast Siding and Insulation Co. v. Alco Vending, Inc.*, 2017 WL 3686552 at *9 (finding typicality based upon each class member receiving the same fax). Although typicality does not require sameness in every respect, a class cannot be comprised of one.

### 4. Adequacy

#### a. Adequacy of the Representative

Plaintiff argues that Sawyer would be an adequate class representative, because he possesses the same interest and suffered the same injury ($500 in statutory damages) as the other 34,772 members of the class he seeks to represent. But Defendant maintains that Plaintiff alone has received an unsolicited fax, and Plaintiff has offered no evidence to the contrary. Obviously this issue is closely aligned with the core factual dispute of consent, but on the record presented, it removes Plaintiff from being an adequate class representative.

#### b. Adequacy of Plaintiff's Counsel

Plaintiff's counsel points out that his firm "has handled [junk fax] claims for years and has been designated as class counsel in many successful [junk fax] matters, including several in the 6th Circuit and one before this particular Court." (*See* Doc 23 at

---

[20]The fact that Defendant admits to sending the same fax to 1,000-10,000 recipients does not, on its own, establish typicality since there is no evidence to show who received the specific fax in question.

17, citing Declaration of Matthew E. Stubbs, Doc. 23-1). Counsel states that he and others at his firm have performed many hours of work to date (150 as of the date of the reply), "with no expectation of compensation absent the certification of a class." (*Id.*) Counsel argues that "[n]o other law firm has expended such time and resources in an effort to certify a class, thereby providing a remedy to those persons injured by KRS's apparent violation of the JFPA."[21] (Doc. 25 at 6).

Defendant does not dispute that counsel has successfully represented other plaintiffs in junk fax cases. However, Defendant challenges the adequacy of counsel's representation *in this case* based upon the "unfair manipulation of the evidence adduced in discovery in this case and their ignoring plainly applicable and controlling Sixth Circuit law governing class certification" which Defendant describes as "especially troubling in the light of the fact that [Plaintiff's counsel] was counsel in *Sandusky Wellness*, the very Sixth Circuit case controlling here, which is never once cited in plaintiff's present Motion or listed in attorney Matthew Stubb's accompanying Declaration listing class action cases in which he has participated." (Doc. 24 at 20). Defendant goes further, arguing that Plaintiff's predominance argument, "besides being utterly unconvincing, evinces either a woeful lack of knowledge of applicable law or a deliberate attempt to hide plainly applicable, controlling law and mislead this Court." (*Id.*)

---

[21]The grant of class certification can be lucrative. In *Michel v. WM Healthcare Solutions, Inc.*, Case No. 1:10-cv-638, 2014 WL 497031 (S.D. Ohio Feb. 7, 2014), Plaintiff's firm was awarded $656,250 in attorney's fees. *Michel* involved a familiar fact pattern where the defendant had employed a third party to fax defendant's advertisements to purchased lists of recipients. Because the case was resolved through settlement on a class-wide basis, class certification was not disputed. Other firms are similarly known for filing TCPA junk fax cases. *Accord, Machesney v. Lar-Bev of Howell, Inc.*, 2017 WL 2437207 at *4 (noting that same counsel had filed more than 71 "incredibly similar" cases).

In reply, Plaintiff's counsel dismisses KRS's characterization of counsel's arguments as hyperbole, and argues that it accurately cited evidence and quoted deposition testimony in a manner that was consistent with the representation of its client, and not in any way unethical or improper. As to its failure to cite to the Sixth Circuit's decision in *Sandusky Wellness*, Plaintiff's counsel first argues (mistakenly) that it did cite the Sixth Circuit's opinion, and then argues that the decision supports class certification here.

The undersigned applauds zealous representation, but cautions against advocacy that ignores key facts or controlling contrary case law. Plaintiff's original motion for class certification included a footnote citation only to the unpublished district court decision, not to the Sixth Circuit's published decision. The latter decision is controlling, and strongly disfavors class certification for the reasons discussed. However, because the Court does not need to reach a conclusion on the adequacy of counsel's representation of the proposed class in light of the recommendations above, the Court declines to do so at this time.

### III.     Conclusion and Recommendation

For the reasons stated, **IT IS RECOMMENDED THAT** Plaintiff's motion for class certification (Doc. 23) be **DENIED**.


                                                     *s/ Stephanie K. Bowman*
                                                    Stephanie K. Bowman
                                                    United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

WILLIAM P. SAWYER d/b/a
SHARONVILLE FAMILY MEDICINE,                    Case No. 1:16-cv-550

                        Plaintiff,                    Dlott, J.
     v.                    Bowman, M.J.

KRS BIOTECHNOLOGY, INC., et al.,

                Defendants.

### NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).